```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------x
RAYMOND MARTINEZ, as Administrator of
the Estate of Robert Ortiz,

                         Plaintiff,
                                              MEMORANDUM & ORDER
               -against-                      15-CV-5724(EK)(LB)

POLICE OFFICER JAMES HASPER,
Individually and in his Official
Capacity,

                         Defendant.
---------------------------------------x
```

ERIC KOMITEE, United States District Judge:

Decedent Robert Ortiz, through his administrator, brings claims against NYPD officer James Hasper under 42 U.S.C. § 1983 and state law for battery.[1]  His claims arise from an incident in which officer Hasper shot Ortiz after Ortiz led police on a car chase through Brooklyn and, after finding himself hemmed in on a crowded street, rammed a police car in an effort to continue his flight.  Defendant Hasper moves for summary judgment on these claims.  For the reasons set out below, Hasper's motion is granted.

## I. Background

---

[1] The amended complaint also asserted claims for malicious prosecution, denial of the right to a fair trial, and abuse of process against the City of New York and several other NYPD officers who were present during the shooting. *See generally* Amended Complaint, ECF No. 58.  Plaintiff voluntarily dismissed these claims in July 2020.  *See* Order dated July 14, 2020.  No claims remain against the City, as Plaintiff did not assert the remaining excessive-force and battery claims against it.

The following facts are drawn from the parties' Local Rule 56.1 statements, deposition transcripts, video footage of the incident, and other documentary materials the parties submitted.

The events leading up to the shooting are largely undisputed. Ortiz was driving while intoxicated, having consumed "a pint of E&J brandy" and smoked a "dime bag" of marijuana.[2] Officers began pursuing Ortiz after he proceeded straight through an intersection from the left-turn-only lane, cutting off and side-swiping a van in the process, on Rockaway Parkway in Brooklyn. Seeing the officers, Ortiz sped up, drove down a side street, struck a fire hydrant, re-emerged on Rockaway Parkway, and continued driving until he encountered traffic on a busy stretch of that street. As Ortiz approached the traffic, Officer Hasper, who was in an unmarked vehicle in the vicinity, joined the pursuit.

The moments leading up to and including the shooting were captured on video by a storefront security camera on Rockaway Parkway, and this decision is based in significant part on my review of that video. *See, e.g.*, *City of Tahlequah v. Bond*, 595 U.S. ----, slip op. at 1-3 (2021) (reversing Court of Appeals and reinstating district court's grant of summary

---

[2] Plaintiff contends that his intoxication is "irrelevant" but does not contest the accuracy of the contention. See Plaintiff's 56.1 Statement ¶¶ 4-8.

judgment in excessive-force case, based in significant part on body-camera video); *Scott v. Harris*, 550 U.S. 372 (2007) (reversing denial of summary judgment in a fleeing-motorist case where video recording "clearly contradicts the version of the story told by respondent").

      The video recording is two minutes and one second long.  It shows Ortiz's 1995 Chevy Suburban driving down Rockaway Parkway, which at that point is a two-lane street with parked cars on the side of both traffic lanes.  Exhibit L – Surveillance footage ("video recording"), ECF No. 115-12.  A number of pedestrians are visible on the near sidewalk and in a crosswalk in the background.  Before Ortiz's vehicle enters the frame, at approximately the thirteen-second mark, we see a woman run into the foreground of the video, hurriedly pushing a child off the sidewalk and into a store.  Ortiz's black Suburban appears two or three seconds later, traveling at a higher rate of speed than the cars that preceded it.  Though no lane markings are visible, it is clear that Ortiz is driving at least partially in the path of oncoming traffic, as he navigates around a double-parked car on his right.  Officers are running along the passenger side of the Suburban; at the same time, numerous pedestrians run for cover.

      Around the eighteen-second mark, Ortiz comes to a stop just short of a car stopped in front of him.  A police car pulls

3

up and parks behind him.  As more officers approach, Ortiz reverses the Suburban, which weighs more than two-and-a-half tons,[3] and crashes into the police car with enough force that the police vehicle rocks (violently, at first) for more than five full seconds.  *See* Defendant's 56.1 Statement, ¶¶ 23, ECF No. 112; video recording at 0:20-0:28.  After hitting the police car, the Suburban launches forward towards several police officers.  The SUV pauses momentarily, then accelerates forward and hits the car in front of it hard, pushing it forward into another vehicle.  (The car Ortiz hit was driven by Carlene Davis, a civilian who had her two-year old child with her.)  *See* Plaintiff's 56.1 Statement, ¶ 21, 65-66, ECF No. 114.

From the video recording (which has no sound), it is not possible to tell the precise moment when Hasper fired his weapon.  The parties have given varying accounts.  At his 2017 criminal trial on charges of reckless endangerment and assault, Ortiz testified that he "got shot as soon as [he] hit the cop car behind [him]."  Criminal Trial Transcript 797:11-13, ECF No. 111-3.  At his deposition in this case, however, Ortiz testified that he backed into the police car, put his car in drive, drove forward, and stopped his vehicle because Ms. Davis's car was in

---

[3] Edmunds, *Used 1995 Chevrolet Suburban Specs & Features*, https://www.edmunds.com/chevrolet/suburban/1995/features-specs/ (last visited Nov. 17, 2021) (listing "Curb Weight" of 5,587 pounds).

4

the way, and then was shot. 56.1 ¶ 27. He stated that he slumped over the wheel, and only then hit Ms. Davis's car. 56.1 ¶ 65. Ortiz also points to the deposition testimony of another officer on the scene, P.O. Ramos, who testified that Ortiz's vehicle was not in motion when he was shot. *See* Def.'s 56.1 Statement ¶ 64. Hasper, for his part, maintains that he ordered Ortiz to stop and exit the vehicle before discharging his weapon, *id.* at ¶ 33-34, and that he fired "at some point after" Ortiz backed into the police vehicle. *Id.* at ¶ 25.

Ortiz sustained serious injuries and was hospitalized for thirteen days. He survived the shooting but died from unrelated causes four years later. Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. Judgment ("Pl.'s Opp. Br.") at 1 n.1, ECF No. 116.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact" and that she "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). A genuine dispute is one that can "reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In performing this analysis, the Court must resolve all ambiguities

5

and draw all inferences in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). "If, in this generous light, a material issue is found to exist, summary judgment is improper." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999).

The moving party may establish that there is no genuine dispute "by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the moving party meets this burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).[4] If "no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.*

### III.  Discussion

---

[4] Unless otherwise noted, when quoting judicial decisions this order omits all alterations, citations, footnotes, and internal quotation marks.

Plaintiff brings claims for excessive force and battery. I address excessive force, the sole federal claim, first.

**A.  Excessive Force**

A police officer's application of force is excessive "if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004). The use of deadly force is circumscribed by constitutional decisions dating back to *Tennessee v Garner,* 471 U.S. 1, 3 (1985)). Under that decision and its progeny, deadly force is permissible only when an "officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Cowan ex rel. Cooper v. Breen*, 352 F.3d 756, 764 (2d Cir. 2003) (citing *Garner*, 471 U.S. at 3); *see also Thevenin v. French*, 850 F. App'x 32, 35 (2d Cir. 2021) (summary order) (confirming that *Cowan* remains "clearly established law in this Circuit"). The Second Circuit does not appear to have defined the phrase "significant physical injury" with precision.[5]

---

[5] *See, e.g.*, Hasper's Supp. Letter at 9, ECF No. 125 ("[N]o [c]ourt has specifically delineated the categories of injury that would constitute 'serious physical injury,' in this specific context."); Pl.'s Supp. Letter at 21, ECF No. 126 (pointing to definitions under New York Penal Law and the Model Penal Codes). However high the threshold is set, the assessment must take into account both the severity of the potential harm the officer is trying to prevent and also the probability that such harm will come to pass.

7

In determining whether the use of force was reasonable, courts consider "the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996). Courts must view the "reasonableness of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

**B.  Qualified Immunity**

The excessive-force claim against Hasper, a police officer, must be viewed through the lens of qualified immunity. *See City of Tahlequah*, 595 U.S. ----; *Rivas-Villegas v. Cortesluna*, 595 U.S. ----, slip op. at 2 (2021) (per curiam). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When an official asserts a qualified immunity defense, courts consider whether "(1) the official violated a statutory or constitutional right, and (2) . . . the right was 'clearly established' at the time of the challenged conduct." *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194

8

(2001)). Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011).

In excessive-force claims, the reasonableness inquiry "overlap[s]" with the qualified-immunity analysis. *Cowan*, 352 F.3d at 764. The difference is that "the qualified immunity inquiry goes on to ask whether any constitutional violation was clearly established." *Jackson v. Tellado*, 236 F. Supp. 3d 636, 661 (E.D.N.Y. 2017). A constitutional right is clearly established "when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas*, 595 U.S. ----, slip op. at 2 (per curiam) (citing *Mullenix v. Luna*, 577 U. S. 7, 11 (2015); *see also Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (right is clearly established when it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). "[S]pecificity is especially important in the Fourth

9

Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U. S., at 12. The analysis must turn on the given case's specific facts and circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U. S. 386, 396 (1989).

**C.   The Shooting**

Applying the qualified-immunity standard to the danger posed by Ortiz's actions, it is far from clear that Hasper's split-second decision to use deadly force violated clearly established law. Indeed, the weight of authority is to the contrary: the Supreme Court and Second Circuit have, on multiple occasions, afforded qualified immunity to an officer who employed deadly force against a motorist who was driving erratically in a crowded area in an effort to evade arrest. These precedents preclude a determination that an "objectively reasonable" officer would have known that Hasper's action was unlawful.

For instance, in *O'Brien v. Barrows*, 556 F. App'x 2 (2d Cir. 2014) (summary order), which predated Ortiz's shooting, the Second Circuit held that qualified immunity shielded a

10

police officer who shot a motorist, even though the motorist was not near pedestrians and was driving away from the only police officer in the vicinity.  Adopting the district court's reasoning, the Second Circuit recognized that O'Brien had been driving erratically, "back[ed] away" upon seeing police cruisers, came within "five feet" of hitting an officer, and then "took off" toward a "busy road."  *O'Brien v. Barrows*, No. 1:10-CV-173, 2013 WL 486655, at *7 (D. Vt. Feb. 7, 2013); *see also O'Brien*, 556 F. App'x at 4 (affirming summary judgment "[f]or substantially the reasons stated by the district court").  In the Second Circuit's view, "no clearly established law made the unlawfulness of [the officer's] conduct apparent."  *O'Brien*, 556 F. App'x at 4.

      The same is true here.  In light of *O'Brien*, it cannot be said that "existing precedent . . . placed the statutory or constitutional question beyond debate."  *Mullenix*, 577 U.S. at 12.  In some ways, O'Brien posed less risk of bodily harm than Ortiz did.  Unlike O'Brien, Ortiz actually *did* strike a police car.  And Ortiz was driving erratically with officers, pedestrians, and other vehicles mere feet from his vehicle.  *See* video recording at 0:16-0:25.  O'Brien may have been traveling at a higher speed, but Ortiz accelerated rapidly in the critical moments.

11

Plaintiff points to a factual dispute over whether the Suburban was stationary when Hasper pulled the trigger and argues that this dispute precludes summary judgment. Pl.'s Opp. Br. at 7 ("Since the parties have given conflicting testimony as to whether or not the vehicle was stopped at the time of the shooting, summary judgment must be denied."). I view the facts in the light most favorable to the Plaintiff, and therefore presume that Hasper did indeed fire during the very brief moment in which Ortiz came to a stop after hitting the police car, shifting into drive, and pulling forward. That moment lasts about one second or less, and the video simply bears no indication that Ortiz would have remained stopped.[6] Based on the aggressive, evasive action he had taken merely seconds prior — reversing and smashing into a police car — it was eminently reasonable to expect that he would accelerate again.

In *Plumhoff v. Rickard*, 572 U.S. 765, 776 (2014), the Supreme Court reversed the denial of qualified immunity to police officers who used deadly force against a motorist who had endeavored to flee but was at a "near standstill" at the time the shooting occurred. As in *City of Tahlequah*, 595 U.S. ----, and *Rivas-Villegas*, 595 U.S. ----, no Justice dissented. The Court observed that the driver had, prior to stopping, posed a

---

[6] Ortiz hits the police car behind him at the twenty-one second mark in the video and Ms. Davis's car in front at the twenty-four second mark. In between, he comes to a standstill or near-standstill for mere instants.

12

"grave public safety risk" by his reckless driving. *Plumhoff*, 572 U.S. at 776. Even though he "came temporarily to a near standstill" before the shooting, the police officers were justified in using deadly force, the Court held, because the circumstances suggested that the driver would resume his flight and again pose a deadly threat to others. *Id.*

*Plumhoff* is notable because the Supreme Court held not only that the officers were entitled to qualified immunity, but that their actions *actually comported* with the Fourth Amendment — that is, that no constitutional violation occurred, clearly established or not.[7] This Court need not go so far under the current circumstances. It suffices, instead, to say that this factual scenario, even if distinguishable in some regards from *Plumhoff*, is sufficiently overlapping that a reasonable officer could not be expected to distinguish it with confidence. Accordingly, the doctrine of qualified immunity applies to Officer Hasper's action.

---

[7] The Court reached the constitutional question first in *Plumhoff* in light of guidance previously expressed in *Pearson*, 555 U.S. at 236, and *Saucier*, 533 U.S. at 201-02. In *Pearson*, the Court guided Courts of Appeal to consider the value of deciding the underlying constitutional question before the qualified immunity question. This would help "promote[] the development of constitutional precedent," especially "with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Pearson*, 555 U.S. at 236. That guidance does not apply with as much force to district courts, generally speaking. *See Plumhoff*, 572 U.S. at 774 (referring to the value of an "appellate court" deciding the constitutional question first). Accordingly, I consider only the qualified immunity question here.

Ortiz also attempts to resist summary judgment on the basis that no police officers or pedestrians were standing *directly* to the front or rear of the vehicle when he was shot. Given that he was "boxed in" between vehicles, he argues, he posed no threat. But the video shows Ortiz had space to maneuver, and perhaps enough room to escape. A car was able to pass him in the oncoming lane. And the video plainly shows several officers within striking distance of Ortiz's vehicle as well as a crowd of pedestrians on the nearby sidewalk, as in the screenshot[8] below:



---

[8] This image is extracted from Plaintiff's Exhibit L. The raw video footage shows a wider angle, but the Court has zoomed in to the most relevant portion of the screen (the top left) for ease of view.

14

At the top left of the image is Ortiz's SUV, just moments after he hit the NYPD vehicle. An officer is just between the marked NYPD car and Ortiz's vehicle. Multiple officers are beside Ortiz's vehicle (all indicated by circles). The video also clearly reveals (when played) that another officer is near the front left corner of Ortiz's vehicle (below the "2" in 2014 in the video's date stamp), though that officer is rendered somewhat blurry in the still image above. Pedestrians are present, too, both on the sidewalk and in or around parked vehicles. Reviewing the video evidence, these factors permit no genuine dispute here. *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 484 (6th Cir. 2007) (granting summary judgment on excessive-force claim where officers shot fleeing motorist who was driving between police cars that had boxed him in); *Peguero v. City of New York*, No. 12-CV-5184, 2015 WL 1208353, at *9 (S.D.N.Y. Mar. 16, 2015) (granting summary judgment on excessive-force claim, even though the officer "was not in front of the car" when he shot the fleeting motorist); *O'Brien*, 2013 WL 486655, at *8 ("[R]egardless of whether [the police officer] stood to the side of the Plaintiff's car or directly in front of it, the Plaintiff acknowledges accelerating rapidly forward within five feet of the officer.").

Ortiz cites several cases in which courts denied summary judgment on excessive-force claims involving fleeing

15

motorists. None of these cases change the conclusion here.[9] In *Cowan*, the plaintiff adduced evidence that the police officer, who was the only person in plaintiff's vicinity, fired the first of two shots from "about 44 feet" away from the side of plaintiff's vehicle, and that the plaintiff was driving "quite slowly" (if at all) when the officer shot him. *Cowan*, 352 F.3d at 759. And in *Thevenin*, a case with no video evidence, a police officer shot a fleeing motorist following a "low to average speed" chase, after the motorist crashed into a concrete barrier with police vehicles surrounding him. 850 F. App'x at 34, 35. Crucial to the court's determination in *Thevenin* was the conclusion that "no one was in danger" when the officer opened fire. *Id.* at 37. Here, by contrast, Ortiz drove a

---

[9] Ortiz also points to several cases from other circuits, but it is unclear that out-of-circuit cases could serve to "clearly establish" the law governing Hasper's action. In one recent case, the Supreme Court wrote that to be clearly established, a "rule must be settled law, which means it is dictated by *controlling authority or a robust consensus of cases of persuasive authority*." *District of Columbia v. Wesby*, 138 S.Ct. 577, 589-90 (2018) (emphasis added). But in other cases, the Court has suggested that the relevant universe of caselaw is substantially narrower — indeed, that it may include no authority but Supreme Court authority. *See, e.g.*, *Reichle v. Howards*, 566 U.S. 658, 665-66 (2012) ("Assuming arguendo that controlling Court of Appeals' authority could be a dispositive source of clearly established law in the circumstances of this case, the Tenth Circuit's cases do not satisfy the 'clearly established' standard here."); *Rivas-Villegas*, 595 U.S. ----, slip op. at *2 ("Even assuming that controlling Circuit precedent clearly establishes law for purposes of § 1983 . . . ."). The Second Circuit, for its part, has flagged the "decisional law of the Supreme Court and the applicable circuit court" — here, the Second Circuit itself — as the relevant body of case law. *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 271 (2d Cir. 1996). Plaintiff's out-of-circuit cases are factually distinguishable in any event, as they involve little risk of significant harm to pedestrians or others. *See, e.g.*, *Lewis v. Charter Twp. of Flint*, 660 F. App'x 339, 341 (6th Cir. 2016) (following stop for marijuana possession, officer shot and killed motorist — after the car already passed him — with no pedestrians nearby).

16

5,500-pound vehicle in sudden, erratic bursts; struck a police car with substantial force, evincing a strong resolve to escape; and did so with officers at arm's length from his vehicle, and with civilians (both in cars and on the sidewalk) in the immediate vicinity.  In short, Ortiz's actions put many people in danger.  None of the cases Ortiz cites involve this combination of facts, let alone a videotape showing them clearly.  Hasper's motion for summary judgment on the excessive-force claim is therefore granted on qualified-immunity grounds.

**D.   State-law Claim**

Plaintiff also brings a state-law claim for battery against Hasper.  "New York law regarding assault and battery generally parallels federal law regarding excessive force." *Mesa v. City of New York*, 09-cv-10464, 2013 WL 31002, at *27 (S.D.N.Y. January 3, 2013).  While "the doctrine of qualified immunity applies to federal causes of action but is not generally understood to protect officials from claims based on state law," *Stein ex rel. Stein v. Barthelson*, 419 Fed. Appx. 67, 71 (2d Cir. 2011), New York State has its own analogue.  The New York courts "grant government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006).  Plaintiff does not allege that Hasper acted in bad faith, and points to no evidence

17

in the record that would support such a conclusion. Given the Court's analysis on the excessive force claim, qualified immunity applies to the battery claim too. *See Felix v. City of New York*, 408 F. Supp. 3d 304, 312 (S.D.N.Y. 2019) ("The finding of qualified immunity on the excessive force claims requires a grant of summary judgment on assault and battery as well."); *Mesa*, 2013 WL 31002, at *27 ("Thus, as the force employed against Mesa was objectively reasonable under the circumstances - giving rise to a finding of qualified immunity - her assault and battery claims must fail as well.").

### IV. Conclusion

For the reasons set out above, Hasper's motion for summary judgment is granted in its entirety. Because no other claims remain outstanding (against the City of New York or otherwise), the Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

                                       /s/ Eric Komitee
                                       ERIC KOMITEE
                                       United States District Judge

Dated:     November 17, 2021
             Brooklyn, New York